## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**DONNA SIX,**

   **Plaintiff,**

v.           **Case No.: 3:15-cv-14377**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

   **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 7, 10).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7), **GRANT** Defendant's request to affirm the decision of the Commissioner,

(ECF No. 10); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## I.   <u>Procedural History</u>

On March 5, 2012, Plaintiff Donna Six ("Claimant") filed an application for DIB, alleging a disability onset date of March 11, 2011, (Tr. at 173-74), due to mixed connective tissue disease, Raynaud's phenomenon, hyperinsomnia, narcolepsy, migraines, hypothyroidism, and high blood pressure, (Tr. at 192). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 116-20, 122-24). Claimant filed a request for an administrative hearing, which was held on April 3, 2014 before the Honorable H. Munday, Administrative Law Judge ("ALJ"). (Tr. at 28-61). By written decision dated June 3, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 9-27). The ALJ's decision became the final decision of the Commissioner on August 31, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Claimant then filed a Brief in Support of Motion for Judgment on the Pleadings. (ECF No. 7). In response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 10). The time period for Claimant to file a reply has expired. Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 48 years old on the alleged disability onset date and 51 years old on the date of the ALJ's decision. (Tr. at 170). She completed one year of college and

communicates in English. (Tr. at 191, 193). Claimant has previously worked as a system administrator. (Tr. at 193).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination,

the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2016. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 11, 2011, the alleged disability onset date. (Tr. at 14, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairment: "unspecified connective tissue disorder and systematic lupus erythematosus (SLE)." (Tr. at 14-16, Finding No. 3). The ALJ considered Claimant's other alleged impairments of gastroesophageal reflux disease ("GERD"), migraines, pleurisy, hypothyroidism, Raynaud's phenomenon, carpal tunnel syndrome, and hypertension, but found them to be nonsevere, as they caused no more than "minimally vocationally relevant limitations." (Tr. at 15-16, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment

or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. at 17-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined by 20 CFR 404.1567(b) except she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant can never climb ladders, ropes, or scaffolds. She can frequently handle and finger with the bilateral upper extremities. The claimant may have occasional exposure to extreme cold, humidity, and wetness. She may have frequent exposure to extreme heat. The claimant may have occasional exposure to vibrations and pulmonary irritants, including fumes, odors, dust, and gas. She may have occasional exposure to hazardous conditions, including unprotected heights and moving machinery.

(Tr. at 17, Finding No. 5). At the fourth step, the ALJ determined that Claimant was capable of performing her past relevant work as a system administrator. (Tr. at 21-22, Finding No. 6). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 22, Finding No. 7).

## IV.   <u>Claimant's Challenges to the Commissioner's Decision</u>

In her single challenge to the Commissioner's decision, Claimant contends that the ALJ performed an inadequate step three analysis; thereby, rending her decision unsupported by substantial evidence. (ECF No. 7 at 7-12). Claimant argues that the ALJ's step three analysis was "conclusory and uninformative" in that the ALJ simply stated that there was "no evidence" that Claimant's impairments met the criteria in Listings 14.02 (systematic lupus erythematosus) and 14.06 (undifferentiated and mixed connective tissue disease), but did not compare any of Claimant's medical findings to the criteria or provide any explanation for her finding. (*Id.* at 9). According to Claimant, the record clearly demonstrates evidence related to the criteria of Listings 14.02 and 14.06, which warranted a discussion by the ALJ.  (*Id.* at 10-11).

In response, the Commissioner acknowledges that the ALJ's step three discussion was succinct, but contends that it is appropriate because "the record contained no evidence of listings-level medical findings." (ECF No. 10 at 9, 11). Further, the Commissioner argues that even if the court deems the ALJ's discussion to be inadequate, the evidence clearly supports the ALJ's finding and there are no unresolved conflicts of evidence. (*Id.* at 11-12). As such, the Commissioner indicates that remand is not warranted, as it would be futile. (*Id.*).

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, treatment, and evaluations. The relevant medical information is summarized as follows:

### A. *Treatment Records*

For several years prior to the alleged onset of disability, Claimant was treated by rheumatologist, Leah M. Triplett, D.O., at Mountain State Medicine and Rheumatology, PLLC for joint pain and undifferentiated connective tissue disease ("UCTD"). On March 10, 2011, Claimant had a regular follow-up appointment with Dr. Triplett. (Tr. at 364). Claimant stated that she did not feel that she could continue to do her current job due to fatigue and stress, noting that she was on-call at all times. (*Id.*). She reported that her fatigue was worsening. (*Id.*). She had no chest pain or shortness of breath. (Tr. at 364-65). Her blood pressure was 136/94. (Tr. at 446). Dr. Triplett assessed Claimant with mixed connective tissue disease, including puffy hands; Raynaud's Syndrome;[1] bilateral

---

[1] Raynaud's is a rare disorder that affects the arteries.  Raynaud's sometimes is called a disease, syndrome, or phenomenon. The disorder is marked by brief episodes of vasospasm, which is a narrowing of the blood vessels. *See* National Heart, Lung, and Blood Institute, National Institutes of Health, United States Department of Health and Human Services (March 2014).

carpal tunnel syndrome, and worsening fatigue. (Tr. at 366). The plan was to order some tests, continue her current medications for those conditions, and return for follow-up in approximately two months, unless her symptoms worsened or persisted. (*Id.*).

On April 11, 2011, Claimant reported during a regular check-up with her primary care physician, Dr. Karen Miller of Spring Hill Primary Care Physicians, that she had been suffering from chronic fatigue and went to a doctor, who thought it was due to an autoimmune disorder. (Tr. at 254). The physician suggested that Claimant start taking Ritalin. Claimant also complained of experiencing hypertension when at work, although her blood pressure measured 118/62 at the visit. (*Id.*). Claimant additionally mentioned that she had started on short term disability. She had no headache, current complaint of fatigue, or chest pain, and her lungs, heart, abdomen, and extremities were all normal on examination. (*Id.*).

In May and July 2011, Claimant failed to appear for her scheduled appointments with Dr. Triplett and was notified that her care would be terminated in 30 days unless she appeared at the next scheduled appointment. (Tr. at 371, 375, 377). Therefore, on August 23, 2011, Claimant presented to Dr. Triplett's office as scheduled. (Tr. at 378). She expressed complaints regarding her feet and right second metacarpophalangeal (MCP) joint. (*Id.*). Claimant stated that her fatigue was worsening, and she was taken off-work "for narcolepsy," but she had no other constitutional complaints. (*Id.*). Her blood pressure was 140/82. On examination, Dr. Triplett documented that Claimant was alert and in no acute distress. Dr. Triplett inspected and palpated all of Claimant's extremities, tested their range of motion, and measured their strength and stability. Claimant had no abnormal symptoms or findings, with the exception of tenderness over the heels and in the joint of her index finger. (Tr. at 380.). Dr. Triplett assessed Claimant with mixed

connective tissue disease, including puffy hands; Raynaud's Syndrome; bilateral carpal tunnel syndrome; stable fatigue; and a calcaneal spur. (Tr. at 380).

On November 23, 2011, Claimant returned to Dr. Triplett's office, complaining of left shoulder pain for the past two weeks, which was worse with abduction and reaching. (Tr. at 383). She did not attribute the pain to any injury. (*Id.*).  Claimant also reported that her fatigue was worsening, but she denied any other constitutional complaints. (*Id.*). Claimant's blood pressure was 142/86. (Tr. at 434). She was alert and in no acute distress. She was assessed with unspecified disorders of bursae and tendons in her left shoulder region; mixed connective tissue disease, including puffy hands; Raynaud's Syndrome; bilateral carpal tunnel syndrome; stable fatigue; and a resolved calcaneal spur. (Tr. at 385).

On January 24, 2012, Claimant had another check-up with Dr. Miller at Spring Hill Primary Care Physicians. (Tr. at 253). Claimant's blood pressure was 138/76. (*Id.*). She complained of pain when breathing and cold-like symptoms for over a week. (*Id.*). She had a sore throat, but no headache, chest pain, or fatigue. (*Id.*). Claimant's lungs, heart, and extremities were normal. A chest x-ray showed no evidence of an acute pulmonary disease. (Tr. at 260). Dr. Miller diagnosed Claimant with pleuritic chest pain and gave her a Medrol Dose Pak. Her hypertension was noted to be stable.

On April 11, 2012, Claimant followed-up with Dr. Triplett. (Tr. at 393). She reported suffering chest pain six weeks prior, mostly with inspiration. (Tr. at 393). She stated that she was treated by her primary care provider, Dr. Miller, with a good response. However, her symptoms of chest discomfort had recently returned, and she was seen at an urgent care center. Claimant was given a Medrol Dose Pak, which she completed on Monday. (*Id.*). Her blood pressure was 136/80. (Tr. at 394, 446). Claimant also reported

an instance of left knee joint pain and swelling that resolved with elevation and ice.

Dr. Triplett observed that Claimant was alert and in no acute distress. (Tr. at 394). Dr. Triplett performed a physical examination, including inspection, palpation, range of motion testing, and testing of strength and sensation of all extremities. Claimant's sole positive finding was tenderness of the PIP joint of both index fingers. Dr. Triplett assessed Claimant with resolved, unspecified disorders of the bursae and tendons in her left shoulder region; mixed connective tissue disease, including puffy hands; Raynaud's Syndrome; bilateral carpal tunnel syndrome; stable fatigue; pleuritic chest pain; and resolved effusion of the joint and left lower leg. (Tr. at 395).

On May 23, 2012, Claimant saw Dr. Triplett and reported having no change of symptoms since her last visit. (Tr. at 89). (*Id.*). Her fatigue was assessed as stable and her pleuritic chest pain was resolved. (Tr. at 92, 89). Claimant also mentioned that she fell over a rug at home and sprained her ankle, but did not suffer any fractures. Her social history was active, but without a formal exercise program. (Tr. at 93). Claimant's blood pressure was measured at 136/100. However, she had no other constitutional complaints. (Tr. at 93). On examination, Claimant was alert and in no acute distress. Her breath sounds were normal; her heart rate was normal; she had no psychological symptoms; and inspection and testing of the extremities revealed no tenderness, swelling, or deformities, except for right ankle swelling and tenderness in the PIP joints of both index finders. Claimant's range of motion was full and painless in all joints; her strength was 5/5; the joints were stable; and sensation was intact. (Tr. at 93-94). Dr. Triplett diagnosed Claimant with mixed connective tissue disease, including puffy hands; Raynaud's Syndrome; bilateral carpal tunnel syndrome; stable fatigue; resolved pleuritic chest pain; and dizziness. (Tr. at 406).

On May 30, 2012, Claimant saw Dr. Miller for a check-up. (Tr. at 509). She complained of her glucose being low and stated that she had been experiencing a lack of coordination for several months that had caused her to fall down the steps. (*Id.*). Systemically, Claimant described having an intermittent disconnected feeling; however, she was fully oriented, had no malaise, fever, headache, cardiovascular or pulmonary symptoms. (Tr. at 510-11). Her blood pressure was 138/74. (Tr. at 510). Claimant was assessed with hypoglycemia possibly due to poor diet and was given a referral for further evaluation by an endocrinologist. (Tr. at 511).

On July 8, 2012, Claimant was seen by Kuruvilla John, M.D., a board certified neurologist. (Tr. at 284). She complained of intermittent and brief dizziness that started in 2012 and was associated with at least one episode of falling. (Tr. at 282, 284). Claimant had no actual vertigo or lightheadedness, but experienced a non-vertigo image drift, unaccompanied by nausea or vomiting. (Tr. at 282.). Claimant also reported experiencing two to three headaches per month, each usually lasting for 24 hours, that consisted of severe throbbing pain, nausea, and vomiting. (*Id.*). Claimant's blood pressure was 156/102. Dr. John performed a neurological examination of Claimant, which was negative for abnormal findings. (Tr. at 282-83) Dr. John wrote to Dr. Triplett indicating that he was unsure of the cause of Claimant's symptoms, but felt postural hypotension was the most likely possibility. (Tr. at 283). Other possibilities included her mixed connective tissue disease, or drowsiness and fatigue. (*Id.*). He planned to order an MRI of Claimant's brain and tilt table test. (*Id.*).

On August 7, 2012, Claimant presented for regular follow-up with Dr. Triplett. (Tr. at 411). Claimant had no change of symptoms and was continuing to take her prescribed medications. Claimant advised Dr. Triplett that her brain MRI was normal, and Dr. John

thought her problems might be caused by narcolepsy. On examination, Claimant had normal breath sounds, normal heart rate and rhythm, normal affect and mood, and appeared alert and in no acute distress. (Tr. at 412). Her musculoskeletal examination was entirely normal with no findings of pain, swelling, tenderness, deformities or crepitus. Claimant's range of motion was full, without pain; and her strength, stability, and sensation were normal. Dr. Triplett diagnosed Claimant with mixed connective tissue disease, including puffy hands; Raynaud's Syndrome; bilateral carpal tunnel syndrome that was worsening; stable fatigue; dizziness; and hypertension. (Tr. at 413). She was instructed to follow up with Dr. Miller regarding chest pain. (Tr. at 414).

On September 18, 2012, Dr. John wrote a second letter to Dr. Triplett noting that he had seen Claimant, and she reported excessive dizziness and sleepiness. (Tr. at 277). However, the brain MRI was unremarkable. (*Id.*). Claimant was unable to tolerate the tilt table test, but her blood pressure increased rather than decreased. (*Id.*). Dr. John opined that the cause of Claimant's dizziness might be excessive drowsiness, as she reported having been previously diagnosed with narcolepsy and hyperinsomnia. (*Id.*). Dr. John added that Claimant had no issues with her heart or lungs, but reported experiencing joint swelling and pain, headache, confusion, memory loss, falls, and tiredness. (Tr. at 278).

On October 4, 2012, Claimant presented to Charleston Area Medical Center's Emergency Department complaining of shortness of breath and esophageal pain, which she rated 4 on a 10-point pain scale. (Tr. at 295). She had no chest pain, headache, fatigue, or any other issue. (*Id.*). The Emergency Department Physician performed an examination, without any abnormal findings noted. (Tr. at 296). Claimant's blood pressure was elevated at 177/114, but laboratory and medical imaging results were normal. (Tr. at 295). Claimant was assessed with a reflux-type esophageal pain and was

diagnosed with dysphagia. (Tr. at 295-97). Claimant was given a GI cocktail and was discharged in stable condition with instructions to see Dr. Triplett in two to three days. (Tr. at 296-97).

On October 12, 2012, Claimant presented to Dr. Miller, complaining of high blood pressure. (Tr. at 505). She reported that she was currently having an exacerbation of her lupus and believed that the elevation in blood pressure was related to pain. (*Id.*). Claimant denied having any other symptoms. (Tr. at 506-07). Dr. Miller measured Claimant's blood pressure at 144/80. (Tr. at 506). She assessed Claimant with benign essential hypertension and instructed her to monitor her blood pressure and primary hypothyroidism. (Tr. at 507).

On November 7, 2012, Claimant was seen by Dr. Triplett in routine follow-up. (Tr. at 422). Claimant reported increased severe pain and swelling in her right hand, which had persisted for one month. (*Id.*). She presented pictures of her hand that she had taken on her phone, which showed swelling of her right hand and wrist. (*Id.*). She stated that Prednisone helped, but did not completely relieve the symptoms. (*Id.*). Dr. Triplett performed an examination, including a complete inspection, palpation, and assessment of Claimant's extremities. (Tr. at 423-24). The only positive finding was paraspinal muscle tenderness at S1-S2. Claimant was noted to be alert and in no acute distress. (Tr. at 423). She was instructed to complete some routine bloodwork and continue taking her medications. (Tr. at 425).

On January 30, 2013, Claimant presented to Dr. Triplett's office for follow-up. (Tr. at 75). Her symptoms had not changed since the last visit. Claimant continued to complain about swelling and tenderness of the right wrist and bilateral MCP joints and stated that the methotrexate was causing nausea. (*Id.*). Claimant advised that her fatigue

was worsening, but she denied fever, night sweats, or unexplained weight loss. Claimant's blood pressure was measured at 130/90. (Tr. at 76). Dr. Triplett performed a physical examination, including a complete assessment of Claimant's extremities, with no abnormal findings. (Tr. at 76-77). Claimant appeared alert and in no acute distress. (Tr. at 76). Claimant's diagnoses remained the same, and she was instructed to complete bloodwork, continue taking her medications, and monitor her nausea. (Tr. at 78).

On June 20, 2013, Claimant was seen by Dina Criniti, D.O., to establish primary care. (Tr. at 499). Claimant explained that she was there for treatment of chronic health problems, but denied having any acute issues. Claimant admitted to having poor exercise habits, described her occupation as "homemaker," and confirmed that she was functional in activities of daily living. (Tr. at 500). In the review of systems, Claimant only mentioned having dizziness. (Tr. at 501). She had no systematic symptoms, chest pain or discomfort, malaise, fever, or other new issues. (Tr. at 499-500). Claimant appeared fully oriented, and her blood pressure was measured at 126/80. Dr. Criniti did a thorough physical examination, which was unremarkable. (Tr. at 501-02). She diagnosed Claimant with benign essential hypertension, GERD, irritable bowel syndrome, familial combined hyperlipidemia, vitamin D deficiency, primary hypothyroidism, osteopenia, and SLE. (Tr. at 502). She recommended a screening colonoscopy, a mammogram, and a Dexa scan for osteoporosis. Claimant was told to return in four to six months. (*Id.*)

On July 24, 2013, Claimant returned to Dr. Triplett for evaluation of SLE. (Tr. at 483). Claimant advised Dr. Triplett that her symptoms had not changed since her last appointment four months earlier. Overall, Claimant stated that her disease was reasonably controlled, and she could manage with the current level of symptoms. (*Id.*). She reported that the medication methotrexate sodium resulted in a good improvement

in her symptoms. (*Id.*).  She described having moderate morning stiffness lasting 15-30 minutes, but in terms of functional abilities, she was independent in all activities of daily living. (*Id.*). She continued to have mild pain in her bilateral hand joints, which she described as "aching." (*Id.*). The pain was exacerbated by gripping and alleviated by rest; it also tended to be better in the morning and worsened as the day progressed. (*Id.*). Claimant confirmed that oral prednisone helped reduce those symptoms. (*Id.*). She denied constitutional symptoms and appeared alert and in no acute distress. (Tr. at 484). On examination, Claimant's breathing was unlabored and she had normal breath sounds. (Tr. at 485). Her blood pressure was 144/105; however, she admitted that she had not taken her blood pressure medication for several weeks. (Tr. at 484). Claimant's musculoskeletal examination was normal, except for tenderness in the PIP joints of her index and ring fingers. (Tr. at 485). Claimant was diagnosed with SLE, Raynaud's Syndrome, and carpal tunnel syndrome. (*Id.*). She was given orders for bloodwork, refill prescriptions for methotrexate and prednisone, and was instructed to restart her blood pressure medications and monitor her blood pressure at home. (Tr. at 486).

On December 4, 2013, Claimant had an annual physical with Dr. Criniti. (Tr. at 493). She stated that she was always tired, but she had no systemic or other symptoms. (Tr. at 493). She was functional in her activities of daily living. (Tr. at 494). Claimant appeared oriented and no acute distress; she denied dizziness or other neurological symptoms. (Tr. at 495). Claimant's blood pressure was 132/86, and her physical examination was unremarkable. (Tr. at 495-96).  She was diagnosed with benign essential hypertension, Raynaud's disease, GERD, familial combined hyperlipidemia, vitamin D deficiency, primary hypothyroidism, osteopenia, and SLE. (*Id.*). Her conditions were generally described as stable, requiring only supportive care with current medications.

(Tr. at 497). She was told to return in six months.

On December 23, 2013, Claimant saw Dr. Triplett for a regular follow-up evaluation of SLE. (Tr. at 487). She was tolerating her medications well and felt the medication regimen was helpful in reducing her symptoms. (*Id.*). Claimant appeared alert and in no acute distress. Her physical examination was normal, except for tenderness at the PIP joints of her ring and index fingers. (Tr. at 488-89). Dr. Triplett diagnosed Claimant with SLE, Raynaud's Syndrome, carpal tunnel syndrome, and unspecified neutropenia. (Tr. at 489).

### B. *Evaluations and Opinions*

On July 17, 2012, Fulvio Franyutti, M.D., performed a consultative evaluation of Claimant's records at the initial level of her DIB claim. (Tr. at 97-104). Dr. Franyutti concluded that Claimant had severe impairments of essential hypertension and migraines, and non-severe carpal tunnel syndrome. (Tr. at 100). He considered her impairments under Listing 4.12 (Peripheral Artery Disease), but did not find her symptoms to meet the severity criteria of the listed impairment. (*Id.*). Dr. Franyutti found Claimant to be only partially credible, explaining that her purported limitations appeared exaggerated in light of the multiple activities of daily living that she was able to perform. (Tr. at 101). He found that Claimant was limited to light work with additional postural and environmental limitations. (Tr. at 102).

On January 2, 2013, Carl Bancoff, M.D., performed a consultative review of Claimant's record at the reconsideration level of her DIB claim. (Tr. at 106-14). Dr. Bancoff examined Claimant's records through November 2012, concluding from Dr. Triplett's treatment records that Claimant's clinical status was stable. (Tr. at 111). Dr. Bancoff affirmed Dr. Franyutti's assessment. (*Id.*).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant contends that the ALJ performed an inadequate step three analysis, which rendered her decision unsupported by substantial evidence. (ECF No. 7 at 7-12). Claimant argues that the ALJ's step three finding was "conclusory and uninformative," because the ALJ found that Claimant did not meet Listing 14.02 or 14.06, but did not compare any of Claimant's medical findings to the criteria of the listed impairments, or

16

provide any explanation for her findings. (*Id.* at 9). Claimant argues that the administrative record clearly demonstrates the existence of evidence related to the criteria of Listing 14.02 and 14.06, which warranted a discussion by the ALJ. (*Id.* at 10-11). Claimant relies on decisions of the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") in support of her argument; specifically, *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) and *Fox v. Colvin* 632 F. App'x 750, 754 (4th Cir. 2015).

In *Radford v. Colvin,* the Fourth Circuit found that an ALJ's step three discussion was inadequate because it lacked legal analysis and "failed to compare [the claimant's] symptoms to the requirements of any of the … listed impairments, except in a very summary way." *Radford,* 734 F.3d at 295 (quoting *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). The Fourth Circuit noted that the ALJ's perfunctory assessment was particularly inappropriate in Radford's case, because "[his] medical record include[d] a fair amount of evidence supportive of his claim." *Id.* (citing *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987)). The Fourth Circuit added that "[i]f the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* (*quoting Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)).

In *Fox v. Colvin,* the Fourth Circuit again addressed the requirement that an ALJ's written decision include more than a "bare recital that [the ALJ] considered the evidence." *Fox,* 632 F. App'x at 754. The Fourth Circuit emphasized that vague, circular, or boilerplate statements by the ALJ did not provide a sufficient explanation upon which to review the ALJ's decision. *Id.* Moreover, the Fourth Circuit admonished district courts not to conduct the fact-finding exercise that should have been done by the ALJ in the first

instance, stating "[o]ur circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Id.* at 755. The Court explained that a perfunctory analysis by the ALJ was most problematic when "inconsistent evidence abounds," because the reviewing court is then left to wonder "in such a way that [it] cannot conduct 'meaningful review.'" *Id.* (quoting *Mascio v. Colvin,* 780 F.3d 632, 638 (4th Cir. 2015)).

Nevertheless, an ALJ is not expected to produce a written decision that embodies procedural perfection. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988) ("Procedural perfection in administrative proceedings is not required."). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983); *see, also*, *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). Furthermore, "[a] discussion of the relevant evidence elsewhere in the ALJ's opinion may demonstrate that, regardless of an imprecise discussion at step three, the ALJ fully and properly considered all the relevant evidence in his step three analysis." *Robinson v. Colvin*, No. 7:12CV272, 2014 WL 1276507, at *4 (W.D. Va. Mar. 27, 2014); *see also, Patterson v. Colvin,* 2013 WL 4441986, at *5 (D.S.C. Aug. 15, 2013) ("The Fourth

Circuit has held that it is not always necessary for the ALJ to present evidence under a particular step, as long as it is possible, from reading the ALJ's decision in its entirety, to determine whether there was substantial evidence to support the ALJ's conclusions.") (citing *McCarty v. Apfel,* 28 F. App'x 277, 279–80 (4th Cir. 2002)). In other words, "a remand is not warranted 'where it is clear from the record which listing ... [was] considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the Step Three analysis which allows this Court readily to determine whether there was substantial evidence to support the ALJ's Step Three conclusion.'" *Dunford v. Astrue*, No. BPG-10-0124, 2012 WL 380057, at *3 (D. Md. Feb. 3, 2012) (citing *Schoofield v. Barnhart,* 220 F.Supp.2d 512, 522 (D.Md. 2002)); *see also McDaniel v. Colvin,* No. 2:14-cv-28157, 2016 WL 1271509, at *4 (S.D. W.V. Mar. 31, 2016).

At step three of her analysis, the ALJ evaluated Claimant's systemic lupus under Listing 14.02 and her unspecified connective tissue disorder under Listing 14.06. (Tr. at 17, Finding No. 4). Claimant does not object to the ALJ's selection of listed impairments, nor does she contend that the ALJ should have considered additional listings. However, Claimant disagrees with the ALJ's conclusion that there was "no evidence" in the record supporting a finding that Claimant met either listing. According to Claimant, the record shows "the involvement of at least two body systems by way of chronic pleurisy and hypertension with possible hypotension [...] to satisfy Listing 14.02A1 or 14.06A1 criteria." (ECF No. 7 at 10). Further, Claimant states that "in satisfaction of Listing 14.02A2 or 14.06A2 requirements, the record documented [her] chronic fatigue and malaise (e.g. migraine headaches, dizziness, 'drifting')." *(Id.).* She asserts that the ALJ's failure to provide any explanation as to the evidence that informed her step three determination precludes meaningful review by the court and necessitates remand.

With the exception of the descriptive paragraph, the criteria of Listings 14.02 and

14.06 are identical, as indicated below:

14.02 Systemic lupus erythematosus. As described in 14.00D1. With:

A. Involvement of two or more organs/body systems, with:
1. One of the organs/body systems involved to at least a moderate level of severity; and
2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)
or

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 14.02.

14.06 Undifferentiated and mixed connective tissue disease. As described in 14.00D5. With:

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and
2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
or

B. Repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

Id. at § 14.06.

Section 14.00D1 provides general description of SLE, stating:

20

Systemic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern.

*Id.* at § 14.00D1A. Section 14.00D5 contains the general description of undifferentiated and mixed connective tissue disease:

[The listing for undifferentiated and mixed connective tissue disease] includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders described. For example, you may have clinical features of SLE and systemic vasculitis, and the serologic (blood test) findings of rheumatoid arthritis.

*Id.* at § 14.00D5A.

The term "severe fatigue" within the meaning of Listings 14.02 and 14.06 is defined as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function" and the term malaise means "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." *Id.* at § 14.00C2. Further, the term "severe" as used in Listings 14.02 and 14.06 "means medical severity as used by the medical community" and "does not have the same meaning as it does when [used] in connection with a finding at the second step of the sequential evaluation processes." *Id.* at § 14.00C12.

At step three of the sequential evaluation, the ALJ implicitly acknowledged that Claimant's conditions met the descriptive paragraphs of Listings 14.02 and 14.06. However, the ALJ did not see any evidence to corroborate the severity criteria of the

listings: (A) involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity and at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) or (B) repeated manifestations of unspecified connective tissue disorder or SLE with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and a limitation in one of the following at the marked level: activities of daily living; social functioning; or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. (*Id.*). Notably, the mere presence of signs and symptoms related to body systems or organs is insufficient to meet the criteria of the listings. Rather, at least one body system or organ must have associated signs and symptoms that are indicative of moderate severity. While the phrase "moderate severity" is not expressly defined in the listings, that phrase is generally understood to mean more than mild and less than severe.

Clearly, the ALJ could not elaborate in her step three discussion by providing specific references to corroborating evidence given that the ALJ's decision was based upon the *absence* of evidence establishing the severity criteria. Consequently, the court must examine the written decision as a whole to determine if the ALJ considered the relevant evidence and provided an accompanying discussion that was adequate for the court to reasonably evaluate—without doing its own fact-finding—the evidentiary support for the step three decision. Having done so, the undersigned **FINDS** that the ALJ's discussion elsewhere in her opinion readily demonstrates the rationale underlying her step three determination and provides the court with a sufficient explanation to assess whether the step three finding is supported by substantial evidence.

In the course of addressing step two of the disability process and assessing Claimant's RFC, the ALJ thoroughly articulated her analysis of all of the pertinent evidence and reconciled the medical evidence with Claimant's allegations regarding the intensity, persistence, and limiting effects of her symptoms. In light of the circumstances of this particular case, it would have been redundant for the ALJ to reiterate her analysis of the medical evidence at step three when it was clear from the rest of her decision, and evident from the record itself, that Claimant's impairments did not satisfy either listed impairment.

Claimant argues that the record demonstrates "the involvement of at least two body systems by way of chronic pleurisy and hypertension with possible hypotension [...] to satisfy Listing 14.02A1 or 14.06A1 criteria." (ECF No.  7 at 10). While it is true that Claimant had intermittent pleurisy and hypertension, the written decision clearly explains that these conditions were not of moderate severity, as required by the listings. "For a [social security] claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

Beginning at step two of the process, the ALJ examined the severity of Claimant's pleurisy. The ALJ determined that Claimant's pleurisy was nonsevere. While that finding does not precisely correlate to severity under the relevant listings, a step two finding of nonseverity means that the impairment constitutes no more than a slight abnormality and causes no more than minimal limitation in the claimant's ability to do work-related activities. (Tr. at 16). The ALJ explicitly confirmed this in her discussion. (*Id.*). Thus, the ALJ found Claimant's pleurisy to be no more than mild.

The ALJ noted the existence of objective evidence demonstrating that Claimant suffered from pleuritic pain on a few occasions. Nonetheless, the ALJ indicated that Claimant's pleurisy resolved when effectively treated and, therefore, was readily amenable to control by adherence to recommended medical management. (Tr. at 15). The ALJ pointed out that Claimant's pleuritic chest pain responded quickly with the use of a Medrol Dose Pak and antibiotic. (*Id.*). This conclusion is supported by substantial evidence. In April 2012, Claimant reported to Dr. Triplett that she suffered chest pain six weeks prior, but that it was treated with good results by Dr. Miller. The chest discomfort returned and she was seen at an urgent care center and given a Medrol Dose Pak. Dr. Triplett believed that Claimant had pleuritic chest pain. (Tr. at 393, 395). However, as noted by the ALJ, Dr. Triplett stated the following month that Claimant's pleurisy had resolved, again with minimal treatment. (Tr. at 406). Also in May 2012, Claimant saw her primary care provider, Dr. Miller, who did not note any cardiovascular or pulmonary symptoms. (Tr. at 510-11). Pleurisy was not noted during Claimant's August 2012 follow-up appointment with Dr. Triplett, although Dr. Triplett did instruct Claimant to follow up with Dr. Miller for chest pain. (Tr. at 380). Thereafter, in all of her various medical assessments for approximately a year, including visits with Dr. John, Dr. Miller, Dr. Triplett, Dr. Criniti, and other providers, there is no mention of pleurisy. (Tr. at 75-77, 277-78, 295-96, 422-25, 483-86, 499-502, 493-96, 505-07). In December 2013, Claimant reported to Dr. Triplett that she had pleurisy two weeks prior, which was treated with prednisone. (Tr. at 488). However, the condition again resolved. In summary, Claimant's records document a few instances of pleuritic chest pain, which was successfully treated and quickly resolved. Accordingly, there simply is no evidence in the record to substantiate that Claimant's pleurisy was of a moderate degree of severity, as required by

24

the criteria of the listings.

Second, concerning Claimant's hypertension, the ALJ similarly found that the condition was nonsevere, responded well to medication, and "should be amenable to proper control by adherence to recommended medical management and medication compliance." (Tr. at 15). Further, the ALJ identified that Claimant's hypertension was noted as stable as of January 24, 2012. (*Id.*). The record supports this assessment. While Claimant's blood pressure readings in 2011 reflected elevated blood pressure, (Tr. at 254, 446, 434), many of her subsequent records indicate that her hypertension was not an active problem or causing her any symptoms, (Tr. at 366, 380, 385, 253, 395, 92, 406, 509). By January 2012, Claimant's hypertension was stable. (Tr. at 253). Later that year, Dr. Miller assessed Claimant with benign essential hypertension and instructed her to monitor her blood pressure; Claimant's rheumatologist, Dr. Triplett, likewise noted hypertension in Claimant's records. (Tr. at 507, 425). However, in January 2013, Dr. Triplett stated that Claimant's hypertension was resolved. (Tr. at 77). In June and December 2013, Claimant's records again simply reference benign essential hypertension, but are unremarkable in terms of significant symptoms or limitations from that condition, or fail to demonstrate that it was even an active or moderately severe problem. (Tr. at 502, 496).

Claimant's treatment records fail to indicate that Claimant suffered hypertension to at least a moderate degree, as required to satisfy paragraph A1 of Listing 14.06 or 14.02; however, the undersigned recognizes that both non-examining agency consultants in July 2012 and January 2013, respectively, opined that Claimant's essential hypertension was a severe impairment. (Tr. at 100, 111). The undersigned also notes that the ALJ did not address these portions of the agency physicians' evaluations or reconcile them with her

conclusion that Claimant's hypertension was nonsevere. Regardless, even if the ALJ erred by failing to explain that discrepancy, remand is not warranted. The ALJ unequivocally found that Claimant's hypertension and pleuritic chest pain were nonsevere, and she explained what evidence in the record led to that decision. Therefore, further discussion was unnecessary.

The only other impairment that Claimant identifies as satisfying paragraph A1 of Listing 14.06 or 14.02, is her "possible hypotension." (ECF No. 7 at 10). Her own statement shows that this condition was only suggested as a possibility and never actually diagnosed. As the ALJ correctly recounted, in July 2012, Dr. John had a "question" as to whether Claimant had postural hypotension; however, in September 2012, a tilt table test showed that Claimant's blood pressure actually increased rather than decreased as her body was tilted upright. (Tr. at 15). The ALJ's evaluation of the evidence clearly demonstrates that Claimant's "possible hypotension" could not meet the preliminary requirement of Listing 14.06 or 14.02. (Tr. at 277, 283).

Even accepting Claimant's contention that her pleurisy and hypertension count as having two organs or body systems involved, with one at least to a moderate degree, she still cannot meet Listings 14.02 and 14.06 because she does not have constitutional symptoms of severe fatigue, fever, malaise, or involuntary weight loss, or marked mental limitations, as required by the listings. Claimant argues that her "chronic fatigue and malaise (e.g. migraine headaches, dizziness, 'drifting')" meet these criteria, but the ALJ's decision refutes that claim. In assessing Claimant's RFC, the ALJ discussed Claimant's allegations of fatigue, finding that her claims of severe constitutional symptoms were not fully credible, and, in fact, the symptoms were nonsevere. Regarding complaints of worsening fatigue, the ALJ noted that Claimant reported that she could not do her job

due to fatigue and stress, but denied any difficulty with sleep or anxiety. (Tr. at 18). In addition, the ALJ stated that although Claimant indicated that fatigue was a significant problem limiting her ability to perform work activity, her fatigue was described as stable in August 2011 and April 2012. (Tr. at 20, 19). This finding is supported by the evidence. Claimant's records regarding fatigue are inconsistent. Although she often complained of being tired, (Tr. at 76, 93, 278, 364, 378, 423, 493), her medical providers frequently described her as alert and oriented, and her fatigue as stable, or they did not even list the symptom as an issue. (Tr. at 92, 253, 295, 380, 395, 483, 488, 499, 510). No physician diagnosed Claimant's fatigue as "severe," and Claimant repeatedly confirmed that she was capable of performing her activities of daily living and was "active." (Tr. at 364, 378, 383, 393, 404, 411, 430, 433, 436, 448, 457, 484, 494, 500). The ALJ emphasized that Claimant was able to engage in multiple daily activities; including, walking and caring for her dogs, preparing meals, attending to her personal grooming, performing light housework, driving and spending time outside, weekly shopping, making jewelry, attending church, going out to dinner, and watching her siblings playing music. (Tr. at 20).

Regarding malaise, which Claimant suggests was manifested as migraines, dizziness, and drifting,[2] (ECF No. 7 at 10), the ALJ noted that although Claimant reported that she used to have three or four migraines a month, she now had only one or two per month and sometimes went several months between episodes. (Tr. at 15). The ALJ commented that at some medical appointments, Claimant had no complaints of headache. (Tr. at 16). In addition, the ALJ cited that although Claimant reported

---

[2] As previously stated, malaise is actually defined as "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." *Id.* at § 14.00C2.

intermittent and rather brief dizziness to Dr. John in July 2012, her sensory examination, neurological examination, and MRI were normal. (Tr. at 19).

Other portions of the ALJ's decision are also informative regarding her reasoning that Claimant did not have any evidence of impairments severe enough to meet or equal Listing 14.02 or 14.06. The ALJ observed that Claimant's "treatment notes, particularly those by Dr. Triplett, indicate the claimant's conditions are actually under good control, as she reported during multiple visits," which was "contradictory to the severity of limitations given by the claimant during testimony." (Tr. at 20). The ALJ pointed out that in July 2013, Claimant told Dr. Triplett that her disease was reasonably controlled, and she could manage her current level of symptoms. Furthermore, Claimant was found to be independent in all activities of daily living. (Tr. at 19). In addition, the ALJ stated that "claimant's treatment is effective with medications, as reflected by her own acknowledgement to Dr. Triplett on December 23, 2013, that they had resulted in good improvement in her symptoms, particularly the Methotrexate." (Tr. at 20). Further, the ALJ cited that Claimant "consistently reported to Dr. Triplett that she tolerated her medications well, thus she experiences no side effects that would interfere with her ability to perform work activity." (*Id.*).

The ALJ's analysis regarding Claimant's reported malaise is likewise supported by substantial evidence. Claimant did not complain of malaise, headache, or dizziness during her visits in March, April, August, or November 2011 or in January, April, or May 2012. (Tr. at 89-93, 253, 254, 364-65, 383, 393). At the end of May 2012, Claimant reported a lack of coordination, but denied malaise or headache. (Tr. at 510-11). In July 2012, Claimant complained of intermittent and brief dizziness that began in 2012, non-vertigo image drift, and severe headaches two to three times per month. (Tr. at 282). Similarly,

in September 2012, Claimant reported excessive dizziness, headache, and tiredness. (Tr. at 277-78). However, the following month, she denied during two separate visits that she had a headache or any other constitutional complaints. (Tr. at 295, 506). She mentioned dizziness again in January 2013, but in June 2013, she had no headache, systematic symptoms, or malaise. (Tr. at 499-500). In December 2013, Claimant stated that she was always tired, but she had no headache or dizziness. (Tr. at 493, 495). Overall, the record fails to establish that Claimant suffered constitutional symptoms or signs of sufficient severity to meet the Listing.

Therefore, despite the ALJ's purported failure to apply specific evidence to the criteria of the listed impairments at step three of her analysis, the undersigned **FINDS** that the ALJ's discussion elsewhere in her decision adequately demonstrates her reasoning and support for her step three finding and that her ultimate conclusion that Claimant did not meet a listed impairment is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the foregoing findings and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7), **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  October 25, 2016

Cheryl A. Eifert
United States Magistrate Judge